U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed January 5, 2010

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES D. POWELL, SR. and | § | |
| BETTY J. POWELL, | § | CASE NO. 09-30355-SGJ-7 |
|     DEBTORS. | § | |
| | § | |
| AMERICAN BANK OF COMMERCE, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-3100 |
| | § | |
| JAMES D. POWELL, SR., | § | |
|     DEFENDANT. | § | |

### MEMORANDUM OPINION IN SUPPORT OF JUDGMENT THAT INDEBTEDNESS IS NOT EXCEPTED FROM DISCHARGE, PURSUANT TO EITHER 11 U.S.C. §§ 523(a)(2) OR 523(a)(6)

Before this court is the Complaint Objecting to Discharge of Debtor, James D. Powell, Sr. (the "Complaint") brought by American Bank of Commerce (the "Plaintiff" or "ABC") and Debtor's Answer to Complaint Objecting to Discharge (the "Answer") filed by James D. Powell, Sr. (the "Defendant"). This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A) and (I).  This memorandum opinion constitutes the

court's findings of fact and conclusions of law pursuant to

Federal Rules of Bankruptcy Procedure 7052 and 9014.  Where

appropriate, a finding of fact will be construed as a conclusion

of law and *vice versa*.

I.   Procedural Posture

The Defendant and his wife, Betty J. Powell (who is not a

party to the Complaint), filed a joint voluntary chapter 7

bankruptcy petition on January 16, 2009.  The Complaint was filed

on April 13, 2009.  Defendant filed his Answer on May 12, 2009.[1]

Trial was held on November 16, 2009 (the "Trial").  If this Trial

were to be given a name, it would have to be "The Case of the

Disappearing Cattle."

II.  Findings of Fact

### A. The Defendant's Cattle Business

The Defendant is a 76-year-old man, and has been in the

ranching and cattle business for over 65 years.[2]  During the time

---

[1] The Answer also contained a counterclaim against ABC for reasonable attorney's fees and costs incurred by the Defendant in defending this action. ABC filed its Answer of Counter-Defendant American Bank of Commerce to Counterclaim of Counter-Plaintiff James D. Powell, Sr. (the "Answer to Counterclaim") on May 29, 2009.  At the trial, the Plaintiff and Defendant announced a stipulation that they would reserve the issue of attorney's fees, and that after the court's ruling on the Complaint, the winning party would file an application for attorney's fees and would offer the losing party the opportunity to respond.

[2] *See* Plaintiff's Exhibit 12, pg. 9.

-2-

period relevant to this adversary proceeding, the Defendant's business was located in and around Terrell, Texas (east of Dallas) and was comprised of two distinct operations.[3]  One facet of the Defendant's business was the purchase of cattle, after which, the Defendant placed and maintained these cattle on approximately 20 leases around his home (the "Pasture Cattle").[4] The pastures were located in an area with many rivers, creeks, lakes, mesquite and timber growth.[5]  Because of the diverse terrain, it was difficult if not impossible for the Defendant to access every pasture so that he could take an exact count of the Pasture Cattle.[6]  In fact, the Defendant testified that he never performed a physical count of all the Pasture Cattle.[7]  Instead, the Defendant maintained an inventory of the Pasture Cattle by using a "tally book."[8] As cattle were placed in the pastures, the Defendant would make a record of it in his tally book and, consequently, when cattle were taken off of the pastures, the Defendant would likewise make note of it in his tally book.[9]

---

[3] *See* Transcript, pg. 12.

[4] *See* Transcript, pgs. 15-16.

[5] *See* Plaintiff's Exhibit 12, pg. 29.

[6] *See* Transcript, pg. 33.

[7] *See* Transcript, pg. 48.

[8] *See* Transcript, pg. 28.

[9] *Id.*  The court is reminded of an old, bad joke:  How do you count cows?  With a cow-culator.

The second subset of the Defendant's business dealt with moving the Pasture Cattle to feed lots.  Specifically, when the Pasture Cattle were ready to be sold, the Defendant would sell them to feed lots.[10]  Thus, the Pasture Cattle became essentially owned by the feed lots and henceforth were referred to as the "Feed Lot Cattle".[11]  The Defendant transacted business with between four and seven different feed lots.[12]  Each of the feed lots would send a bill to the Defendant, once a month, for charges associated with the upkeep of the Feed Lot Cattle (collectively, the "Feed Bills").[13]  Additionally, the Defendant would receive a close-out statement once the Feed Lot Cattle were sold by the feed lot to third parties (collectively, the "Close-Out Statements"), showing whether or not the Defendant received (or was due) any "equity" on the sale of the Feed Lot Cattle (in other words, showing whether the ultimate sale prices to third parties exceeded both the original proceeds paid to Defendant by the feed lot as well as the charges for upkeep of the cattle by the feed lot prior to ultimate sale).[14]  The Defendant would

---

[10] *See* Transcript, pg. 25-26.

[11] *Id.*

[12] *See* Transcript, pg. 54.

[13] *See* Transcript, pg. 55.

[14] *See* Transcript, pgs. 55-56.

receive hundreds of Close-Out Statements per year.[15]  Somewhat surprisingly to the court (given the nature of the matters in dispute), no Feed Bills nor Close-Out Statements were offered into evidence by the Plaintiff.[16]

### B. The Defendant's Indebtedness to ABC and the So-Called Margin Agreement

ABC asserts indebtedness against the Defendant in the amount of $4,546,154.18.  It is this amount that ABC seeks to have declared nondischargeable in this bankruptcy case, pursuant to Bankruptcy Code Sections 523(a)(2)(B) and (a)(6).  The history of this indebtedness is described below.

On or about May 1, 2002, Defendant executed and delivered to ABC a Promissory Note in the original principal amount of $4,000,000 (the "Note").[17]  The Note allows for multiple advances on a revolving line of credit basis to fund the Defendant's cattle business.  In 2004, the revolving line of credit was increased to a maximum amount of $6,000,000.  In large part, the loan made to the Defendant each year was a renewal of the indebtedness owed from prior years.  The indebtedness evidenced by the Note was at all times secured by a security interest in all equipment and cattle (including offspring) owned and/or

---

[15] *Id.*

[16] The court wonders if they might have been enlightening.

[17] *See* Plaintiff's Exhibit 1.

acquired by the Defendant. More specifically, ABC had a first lien position in all of the Pasture Cattle and a lien on the Debtor's equity in the Feed Lot Cattle.[18]

The last of certain renewal notes executed by Defendant in favor of ABC was dated October 13, 2005, in the principal amount of $6,000,000 (the "Last Renewal Note").[19] The Last Renewal Note extended the maturity date of the indebtedness owed to ABC to October 13, 2006 and, like the previous notes, provided for multiple advances on a revolving line of credit basis. On October 13, 2006, the Defendant was unable to pay ABC the indebtedness owed and a further extension was granted, which extended the maturity date on the Last Renewal Note to January 13, 2008. In connection with this extension, the Defendant signed a rather informal letter agreement[20] with ABC, whereby the Defendant agreed: (1) to provide ABC with annual financial statements and tax returns (with no due-date for same specified); (2) to maintain a 20% equity margin at all times with regard to ABC's collateral (with no mechanics for computing or monitoring the equity margin specified); and (3) to allow ABC to inspect the

---

[18] *See* Transcript, pgs. 16-17.

[19] *See* Plaintiff's Exhibit 2.

[20] *See* Plaintiff's Exhibit 3. The court refers to the letter agreement as "informal" because, among other reasons, it has no title; it was signed by the Debtor a full three months after sent by ABC to him (in January 2007—well after the loan extension); it uses somewhat imprecise language and mechanics; and, frankly, reads like an afterthought to a loan extension.

Pasture Cattle on a semi-annual basis and to inspect the Feed Lot Cattle on a quarterly basis, or more frequently at ABC's discretion (the "Margin Agreement").[21]  ABC placed great significance at Trial on the requirements set forth in this Margin Agreement.

On January 13, 2008, the Defendant was unable to pay the indebtedness owing to ABC and another extension was granted, which extended the maturity date of the Renewal Note to April 13, 2008.

On April 13, 2008, the Defendant was still unable to pay the indebtedness owing to ABC, but ABC granted the Defendant another extension, which extended the maturity date of the Renewal Note to July 13, 2008.

### C. The Inventory Reports, the Dec 06/Mar 07 Balance Sheets, and the 2007 Tax Return

Although not specifically required by the Note, the Renewal Note, or the Margin Agreement (or any other document introduced into evidence), ABC ultimately required that the Defendant submit quarterly inventory reports (collectively, the "Inventory Reports") to it.[22]  ABC appears to have only begun actively requiring these Inventory Reports *after* the Margin Agreement was entered into in connection with the October 13, 2006 extension.

---

[21] *See* Plaintiff's Exhibit 3.

[22] *See* Plaintiff's Exhibit 13, pgs. 26-27.

The Debtor submitted four handwritten Inventory Reports during the latter history of the loan (*i.e.,* for June 2007; September 2007; December 2007; and March 2008), and these are the key pieces of evidence relied upon by the Plaintiff in this adversary proceeding.

Each of the Inventory Reports listed a "Total Cattle Inventory Value" which was comprised of: (a) the gross value of the Pasture Cattle; and (b) the amount of equity Defendant claimed to have in all of the Feed Lot Cattle. The June 21, 2007 Inventory Report signed by the Defendant reflects a Total Cattle Inventory Value of $6,241,005.00 and an equipment value of $1,035,222.00 (the "June 2007 Inventory Report").[23] The September 10, 2007 Inventory Report signed by the Defendant reflects a Total Cattle Inventory Value of $7,001,275.00 and an equipment value of $1,035,222.00 (the "September 2007 Inventory Report").[24]

On December 20, 2007, the Defendant submitted and signed another Inventory Report which reflects a Total Cattle Inventory Value of $6,238,338.00 and an equipment value of $1,035,222.00 (the "December 2007 Inventory Report").[25]

On March 20, 2008, the Defendant submitted and signed

---

[23] *See* Plaintiff's Exhibit 4.

[24] *See* Plaintiff's Exhibit 5.

[25] *See* Plaintiff's Exhibit 6.

another Inventory Report which reflects a Total Cattle Inventory Value of $6,235,080.00 and an equipment value of $1,035,222.00 (the "March 2008 Inventory Report").[26]  This was the last inventory report submitted by the Defendant.

On September 20, 2007, the Defendant also submitted to ABC a "Consolidated Statement of Assets, Liabilities & Net Worth" for "Calendar Year Ending December 31, 2006 and Calendar-Year-To-Date Ending March 31, 2007," reflecting, as of March 20, 2007: (1) his "Total Cattle Inventory" (*i.e.,* the gross value of all the Pasture Cattle and the amount of equity in all the Feed Lot Cattle) to be $7,634,950.00[27]; (2) equipment valued at $1,035,222.00 before the deduction of depreciation and $544,855.00 after the deduction of depreciation; (3) commercial real estate in Terrell, Texas valued at $192,439.00; (4) 106 acres in Lone Oak, Texas valued at $500,000.00; and (5) 104 acres in Lone Oak, Texas valued at $450,000 (the "Dec 06/Mar 07 Balance Sheets").[28]  Accompanying the Dec 06/Mar 07 Balance Sheets was a letter from the Defendant's accountant, Bruce G. Miracle, which stated that the Dec 06/Mar 07 Balance Sheets were unaudited and

---

[26] *See* Plaintiff's Exhibit 7.

[27] This amount is arrived at by taking the "Total Cattle Inventory" on March 20, 2007 ($17,004,700) and subtracting the liability of "Feed Lots: Lubbock, Hill, Cadillac, Sunnyside & Wheeter" on March 20, 2007 ($9,369,750), which equals $7,634,950.00.

[28] *See* Plaintiff's Exhibit 8.

"we recommend that you perform your own due diligence."[29] The Bruce G. Miracle transmittal letter reads as though a statement of revenue and expenses was also sent to ABC, although no statement of revenue or expenses was submitted into evidence.

Finally, after repeated requests by ABC for the Defendant's 2007 tax return, the Defendant finally delivered a copy of his 2007 tax return to ABC on June 6, 2008 (the "2007 Tax Return").[30] The 2007 Tax Return showed a loss from the Defendant's cattle operations in 2007 in the amount of $4,036,544.00.

### D. Liquidation of the Remaining Cattle and the Discovery of the Nonexistent Cattle

After learning of the $4 million dollar loss on the 2007 Tax Return, ABC became alarmed. ABC and the Defendant promptly conducted a cattle inspection of all the livestock owned by the Defendant on June 9, 2008. The inspection revealed that the Defendant then had 1,689 Pasture Cattle, valued at approximately $1,364,000.00. In the most recent inventory report (*i.e.,* the March 2008 Inventory Report)—roughly three months earlier—the Defendant had represented that he owned 6,630 head of Pasture Cattle (aggregate value of $6,235,080.00). Thus, the Defendant had 4,941 fewer head of Pasture Cattle at the time the June 2008 inspection was conducted by ABC (when compared to the most recent

---

[29] *See* Plaintiff's Exhibit 9.

[30] *See* Plaintiff's Exhibit 10.

March 2008 Inventory Report).  ABC argues that 4,941 cattle were either missing as of June 2008 or had been nonexistent (*i.e.,* fabricated in the March 2008 Inventory Report).

At the Trial, the Defendant testified that between March 2008 and June 2008, he had actually sold approximately 2,000 cows.[31]  This evidence seems very credible, since there was also evidence that May is a common time of year to ship cattle.[32] Additionally, if the Defendant was able to obtain an average price of $450 per cow, around this time frame, from the feed lots (which the Defendant also credibly testified to), then the Defendant would have received approximately $900,000 in proceeds (*i.e.,* 2,000 times $450) from the sale of these cattle.[33]  This is reasonably consistent with the testimony of Melissa Jo Hopson, the manager of the Special Assets Division of ABC, who testified that the Defendant paid down his loan to ABC by $806,000 between March of 2008 and June of 2008.[34]  Thus, conceivably, there

---

[31] *See* Transcript, pg. 38.

[32] *See* Transcript, pgs. 62.

[33] *See* Transcript, pg. 38.

[34] *See* Transcript, pg. 139.  Ms. Hopson also testified that the Defendant made $830,000 worth of draws on the line of credit during this time period, $750,000 of which might have been for cattle purchases.  However, she testified that the checks written by the Defendant were "pretty cryptic" and it was difficult to tell whether or not the draws were actually used for cattle purchases.  *Id.*  Ms. Hopson surmised that these checks were for cattle purchases, but there was not enough credible evidence to prove whether or not the Defendant used these funds for additional cattle purchases or whether he used these for other cattle expenses related to his business.  *Id.*  No copies of these checks were actually submitted to the court, nor any other documentation or evidence.  Thus, the court has no credible evidence other

-11-

should have been 4,630 (not 6,630) head of cattle in the pastures as of the June 9, 2008 inspection.  However, that still means 2,941 head of cattle were unaccounted for in the pastures (4,630 minus 1,689) as of June 2008.  As a result of this troubling cattle shortage, ABC sent a letter to the Defendant on June 12, 2008, which notified the Defendant of the acceleration of the maturity date of the Renewal Note and made demand upon the Defendant for the principal amount of $5,756,704.00.[35]

In the summer of 2008, ABC and the Defendant worked together cooperatively to liquidate the remaining livestock in order to reduce ABC's indebtedness.  Sales of the remaining cattle occurred from July 3, 2008 to August 6, 2008.  As a result of the liquidation, the amount of indebtedness owed by Defendant to ABC was reduced to a principal balance of $4,546,154.18.

III. Contentions of the Parties

By the Complaint (as later amended for trial, by stipulation),[36] ABC contends that the indebtedness owing by the Defendant to ABC: (1) constitutes a debt for money, property, services or an extension, renewal, or refinancing of credit

---

than the evidence of the Defendant that he sold 2,000 cows after March 2008.

[35] See Plaintiff's Exhibit 11.

[36] The Plaintiff originally pleaded in its Complaint that the Defendant should be denied a discharge of the ABC indebtedness under section 523(a)(2)(A), as well as under section 523(a)(2)(B) and 523(a)(6).  At the Trial, the Plaintiff and the Defendant stipulated on the record that section 523(a)(2)(A) was not applicable in this adversary proceeding.

obtained by a use of a statement in writing that is materially false, respecting the Defendant's financial condition, on which ABC reasonably relied and the Defendant caused to be made or published with intent to deceive, and, therefore, the Defendant should be denied dischargeability of such indebtedness in accordance with section 523(a)(2)(B) of the Bankruptcy Code; and (2) constitutes a willful and malicious injury by Defendant to ABC and, therefore, the Defendant should be denied dischargeability of the indebtedness in accordance with section 523(a)(6) of the Bankruptcy Code.  The Defendant denies all such allegations.

IV.  Conclusions of Law

### A. Is the Indebtedness Owing to ABC by the Defendant Non-Dischargeable Under Section 523(a)(6)?

For ABC to prevail under section 523(a)(6), ABC must prove, by a preponderance of the evidence, a willful and malicious injury by the Defendant to ABC or its property.  *See McClendon v. Devoll (In re DeVoll)*, 266 B.R. 81, 93 (Bankr. N.D. Tex. 2001).  The word "willful" in section 523(a)(6) modifies "injury," and, therefore, requires ABC to prove "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  *See Rolex Watch U.S.A., Inc. v. Meece (In re Meece)*, 261 B.R. 403, 406 (Bankr. N.D. Tex. 2001) (*citing Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).  Following the Supreme Court's decision in *Kawaauhau v. Geiger*, the Fifth Circuit determined

-13-

that either an objective substantial certainty of injury or a subjective motive to cause injury meets the Supreme Court's definition of "willful" in section 523(a)(6). *See Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998).

As will be further elaborated upon below, the Defendant was unable to offer a very specific explanation for the 2,941 nonexistent head of Pasture Cattle as of June 2008. The Defendant's explanation was that: (a) the Inventory Reports were mere estimates, not physical counts, and ABC well knew it; (b) the Inventory Reports were derived by adding cattle put in and subtracting cattle taken out (at the Defendant's twenty leases), over a period of several years, without deducting (for the most part) for loss of cattle through death (which would be a 5%-10% loss on cattle put in over the years) or for cattle that strayed.

ABC infers that the Defendant may have diverted or sold the missing cattle, and pocketed the proceeds from those sales, since ABC never received any proceeds from the sale of these cattle. However, ABC did not present any evidence showing that this, in fact, occurred. Specifically, ABC did not present any of the Feed Bills or Close-out Statements showing how many cows were coming through the feed lots and what the Defendant was being charged by the feed lots to maintain the Feed Lot Cattle. ABC did not present any other evidence that might suggest the Defendant sold any cattle out of trust. Despite this lack of

evidence, ABC wants this court to find that the Defendant diverted or sold the cattle without ABC's knowledge, **by inference,** from the earlier alleged existence of the cattle, based on the March 2008 Inventory Report, and their later nonexistence when the liquidation occurred between July and August of 2008.

In *Bank of America, N.A. v. Davis (In re Davis)*, No. 01-4024, 2002 Bankr. LEXIS 1953, at *7-8 (Bankr. N.D. Tex. Apr. 30, 2002), the bankruptcy court was faced with very similar facts and was asked by the objector/bank, Bank of America, N.A. ("Bank of America"), to infer that the defendant, Davis, had sold cattle out of trust, based upon the fact that the cattle were accounted for in a previous appraisal, but were missing when Bank of America did a later appraisal. In finding that Bank of America failed to establish the required elements of section 523(a)(6), the bankruptcy court cited to several cases which have inferred a willful and malicious injury from the circumstances surrounding the injury. *See id* at *8. However, the bankruptcy court noted that "all of the cases where the court has held that intent to cause willful and malicious injury can be inferred, the **conduct** was proven, and the **intent** was inferred by virtue of the egregiousness of the conduct." *See id.* (emphasis added). Finding that Bank of America failed to provide any direct or even circumstantial evidence that Davis sold any of the cows without

-15-

Bank of America's knowledge, the bankruptcy court held that the elements of section 523(a)(6) had not been met. *See id.*

For the same reasons cited in *Bank of America, N.A. v. Davis*, as well as the fact that ABC presented no evidence to the court showing that the Defendant possibly diverted or sold the missing cattle without ABC's knowledge, the court finds that ABC has failed, by a preponderance of the evidence, to prove the required elements of section 523(a)(6).

### B. Is the Indebtedness Owing to ABC by the Defendant Non-Dischargeable Under Section 523(a)(2)(B)?

ABC also bears the burden of proof and must establish each of the required elements of a claim under section 523(a)(2)(B) of the Bankruptcy Code by a preponderance of evidence. *See First Nat'l Bank of Byers, N.A. v. Slonaker (In re Slonaker)*, 269 B.R. 595, 602 (Bankr. N.D. Tex. 2001). To prevail on its claim under section 523(a)(2)(B), ABC must prove that there is a debt for "money, property, services, or an extension, renewal or refinancing of credit," which was obtained by (i) a statement in writing; (ii) which was materially false; (iii) respecting the Defendant's financial condition; (iv) upon which ABC reasonably relied; and (v) the statement was given with intent to deceive. *See id.*

Taking the requirements of section 523(a)(2)(B) in order, ABC must first prove that an extension, renewal or refinancing of credit occurred. The Note and the Renewal Note are clearly

-16-

extensions of credit. The Margin Agreement and other agreements between the Defendant and ABC in October 2006 and thereafter arguably merely extended the **maturity date** of the Renewal Note (as opposed to extending credit). However, this court finds that the October 2006 agreements and subsequent agreements essentially allowed the Defendant to continue drawing on the $6 million dollar line of credit and, thus, there was an extension of credit as contemplated under section 523(a)(2)(B). *See also Bank of America, N.A. v. Davis*, 2002 Bankr. LEXIS 1953, at *8-9 (finding that a forbearance agreement alone was an "extension of credit" within the meaning of section 523(a)(2)).

Next, ABC must prove that the Inventory Reports and the Dec 06/Mar 07 Balance Sheets were statements in writing (here, clearly they were) and—before examining whether or not they were materially false—it seems more logical to first determine whether or not they were statements reflecting the Defendant's "financial condition." The Dec 06/Mar 07 Balance Sheets showed the Defendant's assets (including its cattle inventory and equipment) and his liabilities, which seems to easily fit into the definition of a "statement respecting the debtor's . . . financial condition." The Inventory Reports, however, are not quite as straightforward. Neither the definitional section of the Bankruptcy Code (11 U.S.C. § 101), nor any other section of the Bankruptcy Code, defines the term "statement" or even

-17-

"statement respecting financial condition." Courts that have
tried to define the meaning are roughly divided into two camps.
The first line of cases adopts a more limited view and has held
that the phrase "statement respecting the debtor's . . .
financial condition" as used in section 523(a)(2)(B) means
traditional, formal financial statements such as balance sheets,
profit/loss statements, and statements of net worth. *See, e.g.,*
*Gehlhausen v. Olinger (In re Olinger)*, 160 B.R. 1004, 1007-8
(Bankr. S.D. Ind. 1993); *Bal-Ross Grocers, Inc. v. Sansoucy* (*In
re Sansoucy)*, 136 B.R. 20, 23 (Bankr. D.N.H. 1992). Other courts
(and the emerging majority of cases) adopt a more liberal view.
Those courts have defined the phrase to encompass a much broader
class of statements, even those which relate to a single asset or
liability. *See, e.g., Armbrustmacher v. Redburn (In re Redburn)*,
202 B.R. 917, 925-26 (Bankr. W.D. Mich. 1996); *Engler v. Van
Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1060-61 (4th Cir.
1984). Moreover, the bankruptcy court in *Bank of America, N.A.
v. Davis*, adopted the more liberal view and specifically found
that cattle inventory reports fit within the more expansive view
of the term "statement reflecting the debtor's . . . financial
condition." *See Bank of America, N.A. v. Davis*, 2002 Bankr.
LEXIS 1953, at *10-11. This court also adopts the more liberal
view with regard to the definition of "statement respecting the
debtor's . . . financial condition" and concludes that the Dec

-18-

06/Mar 07 Balance Sheets **and** the Inventory Reports most definitely fit into this category.

Next, going backward now in section 523(a)(2)(B), ABC must prove that the Inventory Reports and the Dec 06/Mar 07 Balance Sheets that the Defendant submitted to ABC were "materially false." As stated above, ABC's inspection of the cattle in June of 2008 suggests that the Defendant was missing (or could not account for) approximately 2,941 head of cattle. The Defendant adamantly testified several times during the Trial, that he believed that the discrepancy was due to him not accounting for the dead cattle or "deads" in his tally book for the last five years.[37]

The Defendant specifically testified that the standard variance rate between the number of Pasture Cattle recorded in his tally book and the number of actual Pasture Cattle would be somewhere between 5-10% per year.[38] The Defendant additionally testified that 5-10% may seem high, but there had been extensive drought conditions in both 2005 and 2006, and he believed this variance was reasonable.[39] Moreover, at the Trial, ABC credit department employee Riley James Tulley, who had been one of the personnel to monitor the Defendant's loan with ABC (since late

---

[37] *See* Transcript, pgs. 37, 41, 45 and 46.

[38] *See* Transcript, pg. 46.

[39] *See* Transcript, pg. 41 and 63.

-19-

2007), also testified that 5-10% would be a reasonable variance.[40]  This testimony is also consistent with portions of the Charles Burenheide deposition, which was read into evidence at the Trial.[41]

Doing the math, if the Defendant were to maintain 6,000-7,000 head of cattle per year, a 5-10% death loss would be approximately 300-700 head of cattle per year.  Over a five year period, this could result in a 1500-3500 head of cattle discrepancy.  Thus, there may have been a logical explanation for the "missing" 2,941 head of cattle, in that the Defendant failed to account for "the deads" in his tally book, thereby overstating the value of his assets in both the Inventory Reports and the Dec 06/Mar 07 Balance Sheets.  In any event, it appears that the numbers reported to ABC by the Defendant were severely inaccurate.  Thus, this court finds that ABC has met its burden of proving that the Inventory Reports and the Dec 06/Mar 07 Balance Sheets were materially false.

Moving onto the next and, in the court's opinion, the most pertinent requirement of 523(a)(2)(B) in this adversary proceeding, ABC must prove by a preponderance of the evidence

---

[40] *See* Transcript, pg. 110.

[41] *See* Transcript, pg. 85.  Mr. Burenheide, the senior vice president who had been primarily involved with the Defendant's loan for more than eight years, is no longer employed with ABC (having left ABC in September 2008, shortly after the cattle liquidation) and his only testimony was presented (by agreement) with deposition excerpts.  The two ABC employees who testified at the Trial had very little direct involvement with the Defendant.

that it "reasonably relied" on the Inventory Reports and the Dec 06/Mar 07 Balance Sheets when continuing to extend credit to the Defendant.

The Fifth Circuit has held that whether a creditor's reliance was reasonable under section 523(a)(2)(B) is a factual determination to be made in light of the totality of the circumstances. *See Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993). Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (2) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (3) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. *Id.*

First, the court finds that, as to the first factor, the evidence presented by ABC shows that the Defendant had been a customer of the bank for eight years, had always made regular pay downs on the line of credit, and had never been in default.[42] Thus, there was enough evidence presented by ABC to show that the previous business dealings between the Defendant and ABC probably gave rise to some sort of relationship of trust between the

---

[42] *See* Transcript, pgs. 126 & 128

parties.

However, taking into account the other two factors that the Fifth Circuit articulated in *Coston v. Bank of Malvern*, specifically whether there were any "red flags" that would have alerted an ordinarily prudent lender, and whether some minimal investigation by ABC regarding the status of the Defendant's cattle business would have revealed the inaccuracy of the Defendant's statements that were submitted to ABC, this court finds that ABC was *not* reasonable in its reliance on the Inventory Reports and the Dec 06/Mar 07 Balance Sheets.

First, as to the Inventory Reports, the unrefuted evidence presented at the Trial showed that the Defendant never even submitted the Inventory Reports until after the Margin Agreement was signed.[43] However, ABC represents that the Inventory Reports were a significant requirement of the lending relationship to monitor the Defendant's equity margin in the cattle.[44] Notably, the Margin Agreement did *not*, by its terms, require the Inventory Reports to even be submitted. Rather, the Margin Agreement only required *annual* financial statements and tax returns. Beyond those written reports, the Margin Agreement contemplated that ABC would itself *inspect* the Pasture Cattle twice a year and the Feed Lot Cattle quarterly (or more frequently, if ABC chose so, in its

---

[43] *See* Transcript, pg. 19.

[44] *See* Plaintiff's Exhibit 13, pgs. 26-27.

-22-

discretion). Thus, while the Inventory Reports were clearly inaccurate, it does not appear that any reliance upon the Inventory Reports was reasonable, since they were not even technically required, and because there were to be periodic physical inventory inspections at ABC's discretion. Moreover, the Defendant was quite clear in his testimony that the Inventory Reports were nothing more than recordings of his "tally book," which was a simple, handwritten estimate of the cattle put in a pasture and the cattle taken out of a pasture (on 20 different leases), where the Defendant did not regularly walk the land, physically count the cattle or even subtract with any regularity for the missing, sick, or dead cattle. In fact, the unrefuted testimony of the Defendant was that many of the pastures were thick with mesquite and other growth and were completely inaccessible areas even if the Defendant (a 76-year-old man) had wanted to do an actual count of his cattle. ABC was well aware of all these circumstances; thus, it should *not* have reasonably relied on the Inventory Reports in choosing to extend the Defendant further financing. ABC should have gone out and conducted physical inspections more often—which the loan documentation suggested it would. ***There is no evidence that the Debtor prevented ABC from doing this; discouraged ABC from doing this; or misled ABC somehow in doing this.***

As to the Dec 06/Mar 07 Balance Sheets, this court finds

-23-

that ABC's reliance upon this document was also not reasonable. First, the Margin Agreement *did* require the Defendant to provide ABC with annual financial statements and tax returns, so, at first glance, it does seem fairly legitimate for ABC to have considered the Dec 06/Mar 07 Balance Sheets, when deciding on whether or not it should continue extending credit to the Defendant.[45] However, the court finds that ABC's reliance was still unreasonable, in light of the Defendant's 2006 tax return.

Although ABC did not offer the 2006 tax return into evidence, the Defendant credibly testified that he had reported over a $1 million dollar loss in 2006 and that "the bank saw it."[46] Moreover, the Defendant credibly testified that, even knowing about the substantial 2006 loss, ABC did not do any further inspections on the Pasture Cattle and did not go to the feed lots.[47] Having already known that the Defendant was sustaining losses on his 2006 tax return (which tax return would have been available to ABC in mid-2007), it was not reasonable for ABC to rely on the Dec 06/Mar 07 Balance Sheets (received in September 2007), since the 2006 loss should have been reflected

---

[45] Additionally, all of the financial statements (including the Dec 06/Mar 07 Balance Sheets) submitted by the Defendant were prepared by a certified public accountant, however, the court would note that the financial statements were unaudited. *See* Plaintiff's Exhibit 9.

[46] *See* Transcript, pg. 56. Melissa Jo Hopson, the manager of the Special Assets Division of ABC, also testified that "his tax returns always showed some kind of loss." *See* Transcript, pg. 133.

[47] *See* Transcript, pgs. 56-57.

(to some degree) in the Dec 06/Mar 07 Balance Sheets.
Specifically, the Defendant should have shown a lower level of
cattle inventory in the Dec 06/Mar 07 Balance Sheets.  In the
deposition of former ABC employee Charles O. Burenheide, which
was submitted as Plaintiff's Exhibit 13, Mr. Burenheide testified
that if the Defendant was sustaining substantial losses on his
tax returns, then he would not have had the cash flow to
continually purchase a consistent level of inventory.  The Dec
06/Mar 07 Balance Sheets reflected a Total Cattle Inventory level
of $7,634,950.00 as of March 20, 2007, which was not
significantly different from the level reported in 2006.  Having
seen a reported loss of $1 million dollars in 2006, ABC should
have been somewhat surprised to find that the asset levels of the
Defendant had remained somewhat steady.  This should have been a
"red flag" to a prudent lender, indeed.[48]

In summation, ABC was relying, for the most part, on
handwritten tally books of an elderly man who was not a
particularly business-savvy individual.  Since the Defendant's
loans had always been performing, ABC did not feel the need to
look further into the accuracy of the Defendant's accounting

---

[48] The court cannot help but wonder why the income statement (*i.e.*,
statement of revenues and expenses) that was apparently submitted to ABC along
with the Dec 06/Mar 07 Balance Sheets (according to Plaintiff's Exhibit 9) was
not offered into evidence.  Presumably, it would have shown losses (consistent
with the 2006 and 2007 tax returns).  Such losses would have been "red flags."
On the other hands, if the income statement did *not* show losses, this would
have been inconsistent with the tax returns (and, therefore, still a "red
flag").

techniques. Had ABC (a) performed regular physical inspections
of the Pasture Cattle and Feed Lot Cattle, as the Margin
Agreement had contemplated, (b) paid closer attention to the Feed
Bills and Close-Out Statements available to them from the feed
lots, and (c) focused more intensely before June 2008 on the
Defendant's profitability (or lack thereof), they would have been
able to determine what seems easily discernable to this court
from the credible evidence that was presented: that the Defendant
was sustaining losses at the feed lots during the last several
months of his line of credit with ABC and likely could not be
replenishing his Pasture Cattle at the same rates he had in the
past. In fact, the direct testimony of Riley James Tulley, who
monitored the Defendant's loan with ABC (in late 2007 and in
2008), revealed that ABC was only calling the feed lots to
occasionally "spot check" the Defendant's head counts in his
Inventory Reports.[49] However, ABC never reviewed the Feed Bills
or the Close-Out Statements, never went to the feed lots, never
conducted an appraisal of the cattle, rarely if ever undertook
meaningful physical inspections, and, apparently, never focused
on (or cared about) the Defendant's profitability (or lack
thereof). Had ABC taken these actions, it, no doubt, would have
discovered that the feed lots were paying the Defendant less and
less for his cattle (the Defendant's testimony was very credible

---

[49] *See* Transcript, pg. 104.

on this point) once they were sent to the feed lots.  Thus, the Defendant was likely not able to replenish his Pasture Cattle at the same rates as he was selling the Feed Lot Cattle.

Although the court recognizes that the Defendant's tally book and Inventory Reports were inaccurate and, no doubt, prepared with a lack of adequate attention and care (and this is hardly laudable), the court does not think that ABC was reasonable in substantially relying on the handwritten Inventory Reports of an elderly man, especially when ABC had the discretion and ample opportunity to perform physical inspections of both the Pasture Cattle and the Feed Lot Cattle.  With regard to Pasture Cattle, Mr. Tulley testified that he relied on the Defendant completely in regards to how many Pasture Cattle Defendant had.  Specifically, he stated that ABC would "go out there and pay a visit to your customer and, you know, they would give you -- or, they'd take you to the pasture and tell you kind of how many were in the pasture, and kind of get a visual inspection of what was in there".[50]  With regard to the feed lots, closer monitoring of these should have occurred and would have been enlightening to the court in regards to the Defendant's profitability or lack thereof in the last months of the loan relationship.

---

[50] *See* Transcript, pg. 105-06.

-27-

Having concluded that ABC has not met its burden[51] with regard to the "reasonable reliance" element of section 523(a)(2)(B), it is not necessary to decide whether or not the Inventory Reports and Dec 06/Mar 07 Balance Sheets that were submitted to ABC were provided with the intent to deceive.

## V.   Conclusion

Based upon the foregoing, the court finds in favor of the Defendant and the indebtedness owing by the Defendant to ABC, which totals $4,546,154.18, shall be discharged.  A judgment will be entered consistent with this opinion.

### ###END OF MEMORANDUM OPINION###

---

[51] The lack of evidence in this case cannot be overstated.  As mentioned, the Feed Bills and Close-Out Statements from the Feed Lots were not submitted into evidence.  Nor were any records of the Debtor's history of draw downs and pay downs on his line of credit with the bank.  Nor were there any checks, invoices, or any other type of business records from the Debtor's business.  The court had no records whatsoever of when, and from whom, and for how much the Debtor bought and sold cows.  There were no appraisals and no physical inspections signed by the Debtor or anyone else for that matter.  The only evidence was testimony, loan documents, the Inventory Reports, the Dec 06/Mar 07 Balance Sheets (with conspicuously missing statements of revenue/expenses), and the 2007 tax return.  ABC may have thought that this was a fairly simple case and that the court could draw inferences or make conjectures from unaccounted for cattle.  However, such inferences are simply not justified from the record.